4|5                          Schneider v. State of Ohio.

---

420                 CRIMINAL LAW—EVIDENCE—NEW TRIAL.

[Butler Circuit Court, April Term, 1885.]

Cox, Smith and Swing, JJ.

‡GEORGE SCHNEIDER v. STATE OF OHIO.

1. ADMISSION OF CONFESSIONS OR ADMISSIONS OF A DEFENDANT IN A CRIMINAL CASE.

While it is the law, when the confession or admission of a defendant in a criminal case are offered in evidence against him, that all that he said at the same time should be taken, and be considered by the jury, and should have its just weight, it does not follow that all of it is entitled to equal credit. For good reasons, one part of it may be received as true, and another part rejected as false. And where it appears that the body of the crime is clearly shown by other evidence, and it also appears therefrom, that the defendant was the last person seen in the company of the deceased and under suspicious circumstances, and afterwards admits that he was present when the deceased (his mother) was killed, robbed and buried, but alleges that it was done by other persons, and the story told by him in some points inculpating him is strongly corroborated by circumstances, and in those statements exculpating him is wholly improbable and unnatural; and the evidence further shows that he concealed the fact of her death for several weeks, and other circumstances of suspicion are shown against him, the jury might well believe his confession so far as it tended to show his guilt, and disbelieve his statements in his own favor. And where that defendant was convicted on such evidence, and the trial court refused to grant a new trial asked for on the ground that the verdict was against the weight of the evidence, a reviewing court ought not on this ground reverse the judgment.

2. MOTION FOR NEW TRIAL.

When a defendant in such case has been convicted, and a motion for a new trial duly made within three days after the rendition of the verdict, on the ground (among others), that the verdict was against the weight of the evidence, which motion was overruled by the court and the defendant sentenced to be executed, and one month thereafter a second motion was filed by him, ostensibly on the ground of "newly discovered evidence material for the party applying, which he could not with reasonable diligence have discovered and produced at the trial," but the evidence referred to, was

---

‡ Motion for leave to file a petition in error to this decision was overruled by the Supreme Court, June 9, 1885. It was followed by the circuit court in Blythe v. State, 2 Ohio Circ. Dec., (4 C. C., 444).

the affidavits of persons as to the misconduct of one of the jurors, in having before he was called as a juror, expressed an opinion that the defendant was guilty and should be hung, and in having concealed that fact on his examination, it was not error in the trial court to refuse to grant such motion on the ground that it was filed too late. Newly discovered evidence, in the meaning of sec. 7350-1, Rev. Stat., is such as would be presented to the jury on the trial of the issue as to the guilt of the defendant.

3. ALLEGED MISCONDUCT OF A JUROR AS GROUND FOR A NEW TRIAL.

But the whole of the evidence on this point having been brought into the record by a bill of exceptions, it clearly appears that on such evidence the court properly refused to grant the motion. The juror on being examined on the *voir dire* stated that he had both formed and expressed an opinion as to the guilt of the defendant, but further stated to the court that he believed that he could notwithstanding such opinion, render a fair and impartial verdict upon the evidence in the case. No further examination was made of him by either side, or any attempt made to ascertain the nature of such expression or the strength of such opinion, and he was sworn as a juror without any objection. This was a waiver of any objection to him, on the ground that he had formed or expressed such opinion.

4. MISCONDUCT OF THE PROSECUTING ATTORNEY IN HIS ARGUMENT TO THE JURY.

Where a prosecuting attorney in his argument to the jury on such trial, in commenting on confessions, claimed to have been made by the defendant, who was not examined as a witness in the case, made use of this language: "He admits that he was present when she was killed; of course he does not say he killed his mother; he did not get on the stand and say he killed her; he did not tell anyone that he killed his mother; he says that the two robbers killed her, and that he stood by and saw them do it. Is this a reasonable story?" This is not such misconduct of the prosecuting attorney, as would require the trial court to set aside the verdict and grant a new trial. No statement having been made to the jury, as to the right of the defendant to testify, or any comment made on his refusal to do so, and it not appearing that the defendant was in any way prejudiced thereby, it rests in the sound and legal discretion of the trial court.

ERROR to the Court of Common Pleas of Butler county.

SMITH, J.

The plaintiff in error, who at the last term of the court of common pleas of this county, was indicted, tried and convicted of the crime of murder in the first degree, and sentenced to be executed, has filed in this court a petition in error to reverse this judgment, and as grounds therefor alleges that the court erred in refusing to sustain the motion filed by him for a new trial, for the reasons *First*— That the verdict was against the weight of the evidence in the case. *Second*— The court erred in the admission of evidence against the objection of the defendant. *Third*—In refusing to set aside the verdict on account of the misconduct of Wanee who sat as a juror on the trial of the case, and *Fourth*—In refusing to set it aside and grant him a new trial, on the account of alleged misconduct of the prosecuting attorney in his argument to the jury.

This being a case which involves the life of the plaintiff in error, and in which the court is called upon to decide whether so far as it is concerned, the sentence shall be carried out or a new trial be awarded to the defendant, it has been heard and considered by us, as I trust, with a just sense of the grave responsibility resting upon us.

The first question to be determined is. whether the trial court should have set aside the verdict on the ground that it was against the weight of the evidence. If it so appears to us, it will be our duty to correct that error. But in the determination of this question, we must of course bear in mind, that the presumption of the law is that the verdict is right, and that under the well known rules of law, so often pronounced by our Supreme Court, no mere difference of opinion between the trial judge and the jury, upon which tribunal the law in the first instance places the responsibility of settling such questions of fact, will justify him in interfering with such finding. It is only when the verdict is so manifestly against the weight of the evidence, as to induce the opinion that it was the result of passion or prejudice, or the clear result of a mistake on the part of the

jury, that he ought to interfere with it; and much more is this the case with a reviewing court which is not brought face to face with the witnesses, does not see or hear them as they testify, and therefore of necessity is much less fitted than is the trial judge, to determine from their appearance and manner of testifying, and from the thousand things of apparently trivial, but really of great importance which take place in the conduct of the trial, the weight and credit to be given to the evidence of each and all of the witnesses. We have at the best, an imperfect transcript in writing, of what was said there, and as a consequence, have no such opportunity, as has the trial court, to judge as to these matters; but still when it does in fact, clearly appear to a reviewing court that substantial injustice has been done, it is the bounden duty of such court to correct it.

In this case the defendant was convicted under the fourth count of the indictment. It charged, substantially, that at Butler county, Ohio, he unlawfully, purposely and maliciously killed Margaret Schneider, while he was perpetrating or attempting to perpetrate a robbery upon her; and of course to sustain such a finding, the state must have brought evidence to the jury, which established beyond a reasonable doubt the truth of each material fact thus alleged, viz: first, that the Margaret Schneider named in the indictment was dead, and that the defendant killed her in this county, and about the time named in the indictment, and second, that he did it unlawfully, purposely and maliciously, and third, while he was engaged in the perpetration of a robbery upon her.

The state asserts that such proof has been made in this case, while the claim of the counsel for the defendant is, that no one of these three essential elements has been shown by evidence of the weight necessary in such cases.

The first, and in our point of view the *great* question in the case is, was the defendant the person who took the life of his mother? For that she is dead, and that she came to her death by violence, and at the hands of some person other than herself, and in an unlawful manner, and that the killing was done in Butler county, would seem to be established beyond doubt, and we do not understand that any one of these facts is controverted by counsel for the defendant.

And I may also say that it seems to us to be conclusively shown, that if it was the defendant who struck the blows which took the life of his mother, that it was done maliciously and with the purpose to kill her. It is a settled principle of law, that malice is to be presumed from any unlawful killing, unless the contrary appears from the evidence, and where it is shown that the natural, ordinary or necessary consequence of a wound intentionally inflicted with a deadly weapon, upon a vital part of the person of another, would be to cause death, the presumption of the law, (if unexplained) is that the person who so intentionally inflicted such wound, actually purposed and intended to do that which he actually did, that is, to take the life of such person; and as it clearly appears from the evidence here, that the wounds found upon the head of the deceased, were evidently inflicted by a deadly weapon, and upon a vital spot, and which actually did kill her, we have no difficulty in coming to the conclusion, that if the evidence shows that it was the defendant who inflicted these wounds, that he intended at the time to kill her.

It follows then that on this branch of the case, there are but two other questions to be considered, viz.: Was it (as the jury must have found) the defendant who struck the blows which caused the death of the deceased? And if so, was he at the time attempting to rob her? And it cannot be denied on the evidence before us, that these are important and difficult questions.

It is to be noted in their consideration, that there was no *direct* evidence, (as it is called), as to what took place at the time of the homicide; that is, no person who has been examined as a witness, has testified that he *saw* what took place on this night, at the time Mrs. Schneider was killed. The case against the defendant stands entirely on circumstantial evidence, supplemented by what are

claimed to be his admissions or confessions, showing that it was *he* who did the act; and on this state of fact the question is whether the evidence was sufficient to justify the verdict.

It is necessary therefore in the discussion of this question, to review to some extent the evidence in the case, and thus to ascertain what facts were really shown by it; and this I will do as briefly as I can, taking into consideration the great mass of evidence presented to us, and the importance of the question involved.

Mrs. Schneider, the mother of the defendant, and the person claimed to be murdered by him was about 74 years old, a native of Germany. She lived alone in the city of Hamilton, in rented apartments. She had several children living in different parts of the county, and on October 31, 1884, left this city in company with a daughter-in-law, the wife of another son, to go, as she said, to the house of her son George, the defendant, a farmer living some eight or ten miles west of Hamilton. She paid her rent before leaving, and announced to her landlord that she would be absent for some time. She carried with her a small open basket, in which was a change of apparel, or at least a dress and apron; there is evidence tending also to show that there was probably something else in it, as a witness testified that it seemed heavy, and it also appears that while at the house of her son George that evening, she kept it closely at her side, even while she was eating her supper, and the claim is made by the state, that it also contained her money, part in silver and part in bank bills. The proof shows that she was a woman of some means, and that shortly before this time she had received in cash about $100, and that the defendant himself (as will be referred to hereafter), made a statement that she had that sum with her that night, part in silver and part in bills, and the evidence further showing that she had left only a few cents at her room in Hamilton.

The daughter-in-law conveyed the old lady to the village of Darrtown, where she parted with her about 3 P. M., the latter starting to walk to the house of her son George, about two miles further west. What was the object of her visit to him does not appear. It was shown that see was in the habit of visiting her children and staying a few days with each of them occasionally, and judging from the fact that she had with her a change of apparel, the late hour at which she arrived at his house, and her statement to her landlord when she left her room: "I pay you the rent, I am going away," it is highly probable that she had no expectation of returning to Hamilton that night.

As to what took place at the house of the defendant, after she reached there, which was about dusk, we know but little; George was there when she arrived, and supper was soon served and eaten by lamp-light, the old lady sitting at the table with her basket at her side. So far as appears, there were no other persons at the house than the wife of the defendant, their two small children and a son of the wife by a former marriage, at that time about 16 years of age. This boy was examined as a witness, and from him alone do we have any evidence as to what took place there that night. He says that during the supper, or soon thereafter, for some reason, which is wholly unexplained, the taking of the old lady to the railroad station, three miles distant, was broached, and according to the testimony of the step-son, the defendant asked him to take her, which he says he declined to do, as he was afraid, and wanted also to study his lesson; that thereupon George himself went out and hitched his horse to his spring wagon, and his mother went out and got into it with him, and the two started down the lane towards the station, the son sitting on the right hand side of the old lady; that this was between 7 and 8 o'clock, and after dusk. The boy further stated, that as he and his younger brothers were going up stairs to bed, about 8 o'clock, he heard his step-father enter the house, but did not see him, and no inquiry was made, or explanation given as to the cause of his speedy return.

This is substantially all the testimony that was given to what took place there that night, except that which comes in the nature of admissions subsequently

made by the defendant himself, nearly five weeks afterwards,—and looked at simply by itself, and not as supplemented by the statements of the defendants, it is impossible to understand, or see any reason for the conduct it discloses. Admitting it be true, the wonder is, why an old woman, who after a tiresome journey, for one of her years, a part of the way on foot, has reached the house of her son, at night fall, and when the strong presumption is that she came prepared to tarry for a while, should leave his house, without any reason being assigned therefor, and start for a railroad station three miles away, when there is no evidence tending to show that a train could be reached at that hour of the night.

But five weeks after this, new light begins to shine on the transaction. During all of this time, so far as the evidence discloses, not a word had been said by the defendant in regard to his mother, or her whereabouts. Her other children and relations, hearing nothing of her, and becoming anxious about her, begin to make inquiries for her, and the daughter-in-law who had been with her on the day she left Hamilton, and knew of her starting to George's house from Darrtown on October 31, called upon him to know where she was. In a most singular and suspicious manner, he admits his knowledge of where she was, but declines to speak it, and wants to write it down on paper. But being met with an indignant answer from his sister-in-law, and in reply to her demand that she should be informed where she was, he said, " she is dead," and with not nearly so much particularity as was shown by him in subsequent statements of his to other persons, he narrates some of the circumstances of her death as he claimed them to be. This interview with his sister-in-law was in the presence of his wife, and one statement was then made by him which as I recall the evidence, was not made by him to any other person, viz: " that she had a little sack, about that long (indicating) for money."

On the next day he was again interrogated by his brother Henry, and his brother-in-law Jacob Beltz in regard to her death, and after telling them not to get mad about it, he made a detailed statement to them, as to what he said took place, at and before the death of his mother, and afterward ₒₒ he did the same to various persons. These statements, as might naturally be expected, even if made in precisely the same language by the defendant, vary considerably in the details as testified to by the various witnesses who heard them ; but I think the substance of the whole of them is this:

That his mother wanted to go to McGonigle station that night, to come down on the train to Hamilton. That he asked his step-son, William, to take her, but that he refused, because he was afraid, and wanted to study his lesson. That thereupon he himself started with her in the wagon, to go to the station, and that it was then between 7 and 8 o'clock, but that the moon was shining— that they went down his lane till they got to the oak tree, when two men came from behind it, and one of them came up on each side of the wagon—one of the men said " your money or your life"—that both of them got upon his wagon, and one of them struck her on the head. as he thought with a slung shot—that either before or after she was struck, (it is not clear which) she threw her money down —that at some time, she said to the men, " I know you, you have been following me all day." That when struck, she fell from the wagon—that his mother had over $100, part silver and part paper, and that he knew this, because he looked around and saw one of the men, have the paper money in one hand, and the silver in the other, and that one of the men was an American and the other a German.

He further stated that one blow was struck after his mother was on the ground, and that during all this time he was pleading for his own life—that he told the men he had no money, and asked them to spare him for the sake of his family, and that they agreed to do so, if he would promise never to tell of the transaction, and would get them a shovel with which they could bury her. That he swore to them he would never reveal it, and then went back with one of the men to his stable, taking the horse and wagon with him, and gave to the man a

shovel, with which he went back to his companion, leaving the defendant near the straw pile at the stable. That he remained there, and from that distance, about 700 feet, saw the men bury the old woman at a point about 300 feet north of the place where she was killed. That on the next morning he went to the place where she was buried, and finding that her basket and one of her feet were exposed, that he threw dirt upon them and covered them up, and then got a lot of willow brush and spread it over the grave. That he never told anyone about the matter because he was afraid of the two men. In addition to this it was proved by other witnesses, that after the defendant had been arrested, he was taken near to the grave on the night that the body of his mother was being exhumed by the coroner, and was asked to go nearer and see but this he declined to do; saying that he had seen her there once before and did not want to see her again, as he had been sick.

In addition to the statements of the defendant, it was shown that the land on the one side of the spot, where he said she was killed, belonged to him, and that on the other to a neighbor, and that her body was not buried near the oak tree but conveyed in some manner, (probably dragged from the appearances), a distance of 300 feet along the ditch on the defendant's land, and then buried on his ground; and that the body when found was in an almost nude condition—nothing upon the person but an outside dress, a chemise and shoes and stockings; the second dress that she had brought, was in the grave with her.

On this state of fact, can there be any doubt in the mind of any one, but that a most suspicious set of circumstances is shown, and which leads almost irresistibly to the conclusion, that the defendant to say the least, had some guilty connection with this transaction? In the first place he admits, over and over again, that his mother was murdered by some one, and the proof of the body of the crime does not stand on his confession or statements alone, for she is found dead and buried, and with her scull fractured by two blows from some one. And it is entirely clear, (unless his story be true) that he was the only person with her when she was killed. But while he admits that she was murdered, and in his presence, he denies that *he did it*, and asserts that it was done by two robbers, and that his mother said to them that she knew them, and that they had been following her. Of course it may be *possible* that this murder may have been committed as he says it was done. And as his statements are offered in evidence against him, it is fair and right that *everything* he said in relation to the matter should be considered and have its just *weight*, if believed by the jury or court to be true. But we understand that it is clearly the doctrine of the law, that while all of any particular statement, made by a defendant, is to be taken and considered, it does not necessarily follow that all of it is entitled to equal weight and credit. That is, one part of it may be received as true and implicitly believed, and another part be rejected as utterly false. This of course ought not to be done arbitrarily, or without good reasons for so doing, but should be on such grounds as commend themselves to the sound judgment of the tribunal considering it. Roscoe's Criminal Evidence, 55.

Looking, then, at all of the admissions and statements of this defendant, in the light of the law, thus stated, and of the other facts proved in the case, it would seem entirely clear that great reliance might well be placed on some of them. It is morally certain that the mother was murdered, and in his presence, and the great probability is that she was robbed—that her money in silver and bank bills was taken by the person or persons who killed her—that whoever did this, also buried her, and sought to conceal the body and thus the evidence of guilt—for not only do the circumstances of the case, as shown by other witnesses, show this to be true; but the man who was present, and as he says, saw it all, admits and states that it is true, on divers occasions, and there is absolutely nothing disclosed in the case in opposition to or contradiction of it.

But when we come to the other, and vital part of the story, as to the persons who committed the act, what is the real fact as to this, and what credit is to be

given to the statements of the defendant on this point? In the very nature of the case, if he is to be dealt with as a man of ordinary sense and intellect, (and while there is nothing in the evidence which shows that he is not fully and legally responsible for his actions and conduct, there is strong reason to suspect and perhaps believe, that he is of a very low grade of mind), it must be presumed that he told *all* there was to tell in his own favor. His statements are made when the cloud of suspicion was over him. He knew that he was charged with the murder when some of them were made, and that, as he was the last person known to have been with her during her life, that it behooved him to account for her death, and why she had never reached the railroad station, whither she had started in his company.

In view, then, of all the facts in the case and of the statements made by him, the first question is, was his story a reasonable one as to the manner of her death, and consistent with itself and the surrounding circumstances.

In his statements he offers no explanation whatever of his mother leaving his house at this untimely hour of the night, and against her evident intent when she came there. He says the murder was committed by two men lying in wait in his lane at a very considerable distance from his house. Why lying there? Is there anything which gives an air of probability to this statement? It was a *private* lane, in a very secluded spot, away from any public road, or place where persons desiring to commit a robbery would be likely to have an opportunity to do so. The chances were only as one to thousands that any person would be traveling along the lane that night. But it is argued, that the language used by the old woman, when assaulted, as her son reports it, shows that they were waiting for *her* to pass. But how extremely improbable was it that a woman of advanced years, coming to the house of her son, and apparently for a visit to him, would leave it that night. She had not said anything to the daughter-in-law who went with her as far as Darrtown, that she had any intention of returning to Hamilton, or to any one else so far as the evidence shows. And if anything had occurred at his house that evening to indicate that she did have such intention, or had said anything the e about her having been followed, the strong presumption is that the defendant in his admissions would have referred to that, and if anything had in fact been said by her there, he probably would have been able to prove it by members of the family, who were present all the while she was at his house.

But it is highly improbable, also, that there should have been any recognition of the robbers at night by the old woman, or that she should have made any such expression as he says she did. If she had known that she was being followed by such men, of which there is no semblance of proof, it would only have been an additional reason why she should not have left the house of her son. And in the gloom of the evening, even if there was some moonlight, it is not very probable that she would have recognized strangers.

If then these statements be untrue, and if they are sheer fabrications of the defendant, according to settled principles of evidence, the weight thereby given to the theory of his own guilt is very great—for if he invented it, it must have been to shield himself from suspicion. And they are so improbable in their character, and so out of the usual course of affairs, that it is hard to believe that the statements are true.

But there are other allegations of his equally hard to believe. If the two robbers of whom he speaks, were willing to take the life of the mother to effect their purpose of robbery and to guard against detection, why should they stop halfway? Why take the life of the old and feeble woman, and spare the young and vigorous son? Would this be not contrary to our experience and knowledge of human conduct? He says that it was for the sake of his family, in answer to his pleadings, and on condition that he would furnish them with a shovel to bury their victim, which he says he did. But his statements as to this, and that simply to procure an implement for this purpose one of them should have gone back

with him to his house to get it, when a call for help would speedily bring assistance, is incredible, and the idea that a son, who has seen his mother foully murdered, should consent so to act, and at a safe distance quietly stand and witness her burial without giving the alarm, and striving to capture the murderers, is totally unworthy of belief. But why should they bury her at all, and to do so remove her body to a point 100 yards distant? If a murder be committed in utter secrecy, a burial may be advisable to conceal the crime—but who ever heard of a person, who had committed such a crime in the presence of an innocent son, who is allowed freely to depart, and with full opportunity to give the alarm, stop to bury the dead body? The instinct is for flight, and that instantly.

But' stronger and more in opposition to what might naturally be looked for under such circumstances as he describes, he goes quietly to his home, and it may be to sleep, without giving the alarm, and in the morning goes to the spot where she was buried, and finding a part of her person still exposed to view, he makes haste to ·cover it deeper, and thus more effectually to hide the evidence of her murder.—On the same day he comes to this city, and pays off some debts, and transacts his ordinary business, and thenceforward, for some weeks and until inquiry is persistently made of him, is as silent as the grave itself upon the subject. Why was this? He says he was afraid of the robbers to whom he had sworn to be silent. But was this the reason? He lays but little stress upon it in his confessions—and if on his trial before the jury, the defendant appeared as he did during the reading of the evidence and argument of counsel before this court, impassive and unmoved, without the slightest indication of nervousness or dread that I could see, the jury might well have felt warranted in putting very little confidence in his theory that he was prevented by fear from disclosing what he says he saw that night.

In view, then, of the admitted and proven facts in the case, was the evidence sufficient to show that the defendant committed this homicide? Or more properly, was the finding of the jury so manifestly against the weight of the evidence, as to make it obligatory upon the court to so hold, and reverse the judgment? If the jury believed a part of his statements as to the homicide, and that the mother was killed there, and that his story with reference to the two robbers was wholly false and fabricated, as we have said they might, under the law, legally do, then we think their finding as to this was correct, unless there were other facts disclosed in evidence, which went to disprove this conclusion.

It is urged with force by counsel for the plaintiff in error, that such was the fact. And chief among the reasons urged is, that there was absolutely no motive shown (as it is claimed) why the son should have committed this horrible and unnatural crime—that he was her favorite son, and that if the possession of her money was his object, the killing was wholly unnecessary, as she was always willing to aid him in this way. And it is true that there was some evidence tending to support this view. And it is further urged that he was shown to be a man of peaceable character, a member in gcod standing and repute in a christian church, and that it is wholly improbable that he should so suddenly have become base enough to take the life of any one in this way, and particularly of his aged and kind mother. And these are reasons which commend themselves to our careful consideration. But in answer to them, it may be fairly said that the mother was not so yielding and indulgent to the pecuniary wants of her son as she is claimed to have been. It is true that she had loaned him money, but she was careful to take his obligations for it, and when her body was exhumed, there was found concealed in her clothing his note for $800. Neither is it entirely sure from all the evidence that he had for her in her lifetime that love and affection that a son should have for his mother—there are indications to the contrary. But the fact which gives the lie to any such claim of affection on his part, is his conduct as disclosed by himself towards her, at the time, and after her death. No man of right principle or feeling could have acted as he says he did, and the evidence that tends to show that prior to this time he was a man of peaceable disposition,

and with love towards her, makes but little show in the light of his own admissions. But we think, too, a motive and purpose which will be spoken of hereafter, *was* shown by the evidence, and in conclusion on this branch of the case, I will say that we are of the opinion that the finding of the jury that the defendant committed this homicide, is not so clearly against the weight of the evidence as to require us to reverse the judgment on that ground. While we fully concede that in a case involving the life of a man, the highest degree of proof is required before he can be properly convicted, yet, as stated by the Supreme Court in the Clark case, 12 O., 483, " in human affairs absolute certainty is not always attainable—from the nature of things *reasonable certainty* is all that can be attained on many subjects. When a full and candid consideration of the evidence produces a conviction of guilt, and satisfies the mind to a reasonable certainty, a mere captious artificial doubt is of no avail."

Is not such the case here? Taking all the circumstances together—the fact that under suspicious circumstances the son takes his mother from his house at night, and she is never again seen alive—that though he was certainly present at her murder, he gave no alarm then or for weeks after ; that he tells the most improbable stories in regard to the matter when he is compelled to speak; are they not sufficient to warrant the jury in finding that he was the guilty man? Can it be permitted that under such circumstances, all a man has to do to shield himself from conviction and punishment, is to tell a most improbable story—one utterly opposed to the usual and ordinary conduct of mankind? We think not.

The next essential and material fact to be shown by the state was, that the homicide if committed by defendant, was while he was trying to rob his mother, and this too must stand, if at all, on the proof of circumstances and the admission of the defendant himself.

These established sufficiently that she had money, and had it with her ; and goes far to show that she got her money, and if this be so, it adds immense force to the conclusion, that it was he who killed her.

It is shown that on October 28, 1884, three days before the homicide, the defendant was indebted to a merchant in Hamilton in a balance of $16, which he was unable to pay, as he said, until he sold his wood. On November 1st, the very next morning after her death, he came and paid that balance and other debts to the amount of $116, Where did he get the money ? When Metz, the merchant to whom he owed the $16, spoke to him of his paying so soon, he told him he had sold his wood ; but it is shown that all he received for the wood was $13, and there is no explanation as to the source from which he received the other $100 paid out on November 1st, and this in connection with the fact that it is shown with reasonable certainty that his mother had about that sum with her, is certainly a very strong circumstance against him, and under the evidence, if the jury was warranted in finding that he killed his mother, we think they were also justified in finding that he did it for the purpose of robbery.

We therefore feel bound to hold, that we are not authorized to reverse this judgment, because the court refused to set the verdict aside on the ground that it was against the weight of the evidence. What I, or either member of this court might have done as a juror, if on the panel trying this case, we can not say. It is not necessary that we should. It may be that appreciating, as every juror ought, the immense value of a human life, at least to the person on trial, and the dreadful responsibility one labors under who is called to make a decision whether a fellow-man should live or die, and knowing the strong presumption of the law as to the innocence of a defendant until he is clearly proved to be guilty, we might have hesitated. But we feel clear, from a review of the evidence, that there was in this case a moral certainty that the defendant was guilty as charged. It is not necessary however that we should go so far. As I have said, we have only to decide whether the verdict was manifestly against the weight of the evidence, and we hold that it is not, and this assignment of error is not sustained.

The other errors assigned for the reversal of the judgment relate mainly to matters of law, and the discussion of them will be briefer.

It is said that the court erred in receiving in evidence certain statements made by defendant while under arrest. As to this, it is sufficient to say that so far as the bill of exceptions shows, there is not the slightest reason to suppose. that any of these statements were procured from him by any officer or person in authority, or indeed by any other person, by means of any threat, promise or other inducement, but were purely voluntary on the part of the defendant, and entirely proper to be received.

After the motion for a new trial was filed and decided, and nearly a month after the sentence of the defendant, but during the same term of court, a *second* motion for a new trial was filed, on the ground of newly discovered evidence, alleging that Wanee, a juror on the trial, had expressed an opinion against the defendant, after he was summoned as such, but before he was called for examination, to the effect that he thought the defendant would hang, and that if he was on the jury he would put him through if he could ; and that this was unknown to defendant or his counsel until about the time of the filing of the motion ; and the affidavits of two persons were filed, that such language was used by Wanee before he was called into the box. For the state, the affidavit of Wanee was filed denying many of the averments of the other affidavits. He says that he was in the court-house simply as a spectator, and before he was called, and with no expectation that he would be ; that he said, if the defendant was guilty that he ought to be hung, and that if he was on the jury and the testimony was strong enough to prove his guilt positively, that he would go in for hanging him.

It further clearly appears, that when he was examined on his *voir dire*, he frankly stated to the court and counsel that he had both formed and expressed an opinion as to the guilt or innocence of the defendant. But on further examination by the court, he stated that he believed that he could, notwithstanding this opinion, render a fair and impartial verdict on the evidence in the case, and he was received as a juror without further examination or objection.

Now on this state of facts, ought the court to have granted a new trial? The trial judge was of the opinion that it came too late, and would not grant it. The statute, sec. 7350-51, provides, that ''the demand for a new trial shall be by motion on written grounds, filed at the term at which the verdict is rendered, and except for the cause of newly discovered evidence, material for the party applying, which he could not with reasonable diligence have discovered and produced at the trial, within three days after the verdict was rendered, unless unavoidably prevented.'' Misconduct of the jury is a ground for a new trial which must be so produced within the three days.

Did this application come under the head of newly discovered evidence? We incline to the opinion that it did not, but under the clause as to misconduct of the jury—that the evidence referred to in the section is such as would go to the jury on the trial of the question of the guilt of the defendant. But whatever be the fact as to this, as the whole evidence on this point was brought into the record by the bill of exceptions, and we have precisely the same testimony thereon that was before the trial court, we are in position to say that in refusing to sustain the motion on this ground the court did not err to the prejudice of the defendant. As I stated, the juror had formed and expressed an opinion upon the question of the guilt of the defendant. Not an effort was made by the counsel for the defendant to test or ascertain the strength of that opinion, or whether it would readily yield to evidence, or the nature of the expression made by him. Apparently both sides had confidence in the juror, and were willing to risk him, knowing that he had a preconceived opinion. Surely this must be held to be a waiver of any objection on this ground. If, as held by the Supreme Court, a motion for a new trial should not be granted in a case where a member of the

trial jury had also been a member of the grand jury which found the bill, where the proper diligence had not been exercised by the defendant to ascertain the fact, or whether the juror was disqualified, much more should it be so in a case like this, where the defendant was expressly informed that the juror had formed and expressed an opinion, and no further steps were taken by him, and where too it is not at all clear that the juror was in fact disqualified.

The last error assigned is, that the court did not set the verdict aside for the reason of the alleged misconduct of the prosecuting attorney in his argument to the jury.

Section 7286, Rev. Stat., which allows a defendant to testify in his own case at his own request, adds, "but his neglect or refusal to testify shall not create any presumption against him, nor shall any reference be made to, nor any comment be made upon such neglect or refusal."

The affidavit of two persons was filed by the defendant on this point. They say that Mr. Shepherd, in his argument to the jury, used this language: "Of course Geo. Schneider did not say he killed his mother—he did not go on the witness stand and swear he killed her, and *now* he don't say so."

Mr. Shepherd files his own affidavit and says that the language used by him was this: "Gentlemen of the jury, Catharine Schneider is dead. She was killed and buried on the defendant's farm; there is no dispute as to that fact. The defendant himself admits it; he says that he was present when his mother was killed; that is what he told Henry Schneider, that is what he told Jacob Betz, and that is what he told John Mee. Now, how do they say that Catherine Schneider was killed? The state of Ohio says that George Schneider killed her; he admits that he was present when she was killed; of course he does not say he killed his mother; he did not get on the stand and say he killed her; he did not tell any one that he killed his mother; he says that two robbers killed her, and that he stood by and saw them do it—is that a reasonable story?"

The statements of those affidavits being quite different as to what was said by the prosecuting attorney, we suppose that as the court found that there was no misconduct on his part sufficient to justify an interference with the verdict, that we must presume that it must have found from the affidavits that state of fact, most favorable to the state, particularly as all that took place was in the presence of the trial judge. His attention does not seem to have been called to these remarks until after the rendition of the verdict, when of course it was too late to correct the error, if it could in any way be corrected.

It is clearly the policy of the law, that the fact that a defendant on trial, does not avail himself of the privilege of testifying in his case, is not to create any prejudice against him. And it is also expressly stated in the statute, that no reference shall be made to, nor any comment be made on such refusal—that is, the attention of the jury is not to be called to it as raising such a presumption against him. And there is no doubt but that the greatest care should be exercised by the court, and all concerned in the trial, to carry out this direction in its letter and spirit. And the court should be prompt and diligent in rebuking, and punishing if need be, any wilful infraction of it. But it does not follow, that in every case in which it is violated and the defendant is convicted, a new trial must be granted. This was held in Calkins v. State, 18 O. S., 366, 372, in which case the court say: "We suppose a case might occur in which the misconduct of counsel for the state in disregarding the prohibition of the statute above quoted, and of the court in permitting such disregard, or in failing promp ly to rebuke and arrest it by the exercise of all its authority and power necessary for that purpose, would require the court in the exercise of a just discretion, and out of due regard to the rights of the prisoner, to award a new trial. But in this case the prisoner seems to have provoked the single, hasty retort of counsel, and the court does not appear to have been wanting in duty." The effect of this decision is, that to justify the setting aside of a verdict for such cause, there must be a

material and substantial infraction of the law, and one which seems to the trial court, or that reviewing its decision, to have prejudicially affected the rights of the defendant.

We do not feel at all sure, that in this case there has been any violation of the terms of the statute. If we accept Mr. Shepherd's version of his remarks, it is clear that there is but one expression in it, which can be claimed to be such. The argument itself was a legitimate and proper one; it proceeds upon the assumed ground, that the defendant had expressly admitted that his mother was murdered in his presence, and that she was buried on his farm; that the state claimed *he* killed her; that he does not admit that; that he did not *say* to any-one that he did so ; and did not get on the *stand* and say so, and then he inquires of the jury, if the statement of the defendant is a reasonable one.

The only objection to this, is the use of the word "*stand*," doubtless referring to the witness stand, though it is not so definitely put.

In view of the extreme caution which should be shown in cases of this kind by the prosecuting attorney, we think the expression was an unfortunate one, and not well chosen. But the conclusion to which we have arrived is, that the language quoted does not, within the meaning of this section, refer to or make comment on the refusal of the defendant to testify in the case. The law was intended to prevent counsel or court from making known to the jury, that the defendant had a right to testify if he chose to do so, and that having failed to do so, it would warrant an unfavorable inference against him. Anything of this character is prohibited. But here there was no express statement by the prose-cutor, that the defendant had any right to be a witness; there was no attempt to draw an unfavorable inference against him because he had not done so. It is practically a simple statement that at no time or place had defendant admitted that he had killed his mother.

For these reasons and the additional one that no injury seems to have resulted to the defendant therefrom, and that the trial judge, who saw and heard what occurred before him, in the exercise of the just discretion which the Supreme Court says is conferred upon him, has overruled the motion, and therefore must have found that no injury had resulted to the defendant, we do not think that, according to the settled principles of the law on this point, we would be justified in reversing this judgment, and feel constrained to affirm it.

F. S. Vanderveer and J. C. McKemy, for plaintiff in error.

Shepherd, Pros. Atty., and J. F. Neilan, for the state.

NOTE—After this decision of the circuit court, a motion was filed by the attorneys for Schneider in the Supreme Court, for leave to file a petition in error in that court. This motion was overruled June 9, 1885, but no opinion reported.

When Schneider was informed of this action of the court, and that the Governor (to whom an application had been made for a commutation of his sentence) would not interfere with the execution of the sentence, according to the accounts published in the county papers, he made several additional statements as to the manner in which his mother was killed. He admitted that it was *he* who had killed her; and said it was done in the lane near to his house; and for the reason that his mother had made some remarks to him about his family which had aroused his anger. He refused, however, to give any detailed account of the circum-stances, and made no further material statements in regard thereto. He was executed on Friday, June 19, 1885.